# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued March 24, 2022          Decided July 5, 2022

No. 21-1167

THE NASDAQ STOCK MARKET LLC, ET AL.,
PETITIONERS

v.

SECURITIES AND EXCHANGE COMMISSION,
RESPONDENT

———

Consolidated with 21-1168, 21-1169

———

On Petitions for Review of an Order
of the Securities and Exchange Commission

———

*Thomas G. Hungar* argued the cause for petitioners. With him on the briefs were *Paul S. Mishkin, Amir C. Tayrani, Joshua M. Wesneski, Paul E. Greenwalt III,* and *Michael K. Molzberger. Matthew A. Kelley* entered an appearance.

*Tracey A. Hardin*, Assistant General Counsel, Securities and Exchange Commission, argued the cause for respondent. With her on the brief were *Dan M. Berkovitz*, General Counsel, *Michael A. Conley*, Solicitor, and *Emily True Parise*, Senior Litigation Counsel.

*Robert A. Skinner* and *Douglas H. Hallward-Driemeier* were on the brief for *amicus curiae* Investment Company Institute in support of respondent.

Before: HENDERSON and WILKINS, *Circuit Judges*, and SENTELLE, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* HENDERSON.

KAREN LECRAFT HENDERSON, *Circuit Judge*: The Securities Exchange Act of 1934 (Exchange Act), 15 U.S.C. § 78a *et seq.*, directs the Securities and Exchange Commission (Commission) to facilitate the establishment of a national market system (NMS), a key component of which is the public dissemination of market data regarding quotations for and transactions in equity securities. Equity market data is collected, consolidated and disseminated pursuant to NMS plans governed and operated by "self-regulatory organizations" (SROs), groups comprising, in large part, the major national securities exchanges for equity securities. Beginning in 2020, the Commission issued two orders aimed at consolidating the existing NMS plans governing the dissemination of equity market data into a single, consolidated plan (CT Plan) and modifying the governance structure to increase efficiencies, mitigate conflicts of interest among the securities exchanges and facilitate greater involvement by non-exchange stakeholders. *See* Order Directing the Exchanges and the Financial Industry Regulatory Authority To Submit a New National Market System Plan Regarding Consolidated Equity Market Data, 85 Fed. Reg. 28,702 (May 13, 2020) (Governance Order); Order Approving, as Modified, a National Market System Plan Regarding Consolidated Equity Market Data, 86 Fed. Reg. 44,142 (Aug. 11, 2021) (CT Plan Order).

A group of national securities exchanges associated with Nasdaq, Inc. (Nasdaq), the New York Stock Exchange (NYSE) and Cboe Global Markets (Cboe) (collectively, petitioners) challenge the Commission's orders, arguing that several elements are arbitrary and capricious under the Administrative Procedure Act (APA), 5 U.S.C. § 551 *et seq.*, or contrary to the text and goals of the Exchange Act. In particular, petitioners challenge three provisions of the final, Commission-approved CT Plan: (1) the inclusion of representatives of non-SROs as voting members of the CT Plan's operating committee; (2) the grouping of SROs based on corporate affiliation for voting; and (3) the requirement that the administrator of the CT Plan be "independent," meaning independent of any SRO that sells equity market data products.

As detailed *infra*, we grant petitioners' three petitions as to the first challenged provision—non-SRO representation—and deny them in all other respects. Further, because the non-SRO-representation provision is not severable from the CT Plan Order, we vacate that Order in its entirety. We do, however, uphold in large part the Governance Order, which preceded the CT Plan Order and merely directed the SROs to propose an NMS plan that included the three challenged provisions.

## I. BACKGROUND

### A.

In 1975, the Congress sought to modernize regulation of the securities markets through the establishment of a national market system to "distribute market data economically and equally and to promote fair competition among all market participants," *NetCoalition v. SEC*, 615 F.3d 525, 528 (D.C. Cir. 2010), *superseded by statute as stated in NetCoalition v. SEC*, 715 F.3d 342, 344 (D.C. Cir. 2013); *see also Bradford Nat'l Clearing Corp. v. SEC*, 590 F.2d 1085, 1091 (D.C. Cir.

1978) (citing "operational breakdowns and economic distortions" in securities markets as impetus for reforms (quoting H.R. Rep. No. 94-229, at 91 (1975))), and its efforts culminated in the Securities Acts Amendments of 1975, Pub. L. No. 94-29, 89 Stat. 97. The Securities Acts Amendments granted the Commission "broad, discretionary powers" to ensure "maximum flexibility" in "oversee[ing] the development of a national market system" and "implement[ing] its specific components in accordance with the findings and . . . objectives" of the legislation. *See* S. Rep. 94-75, at 7 (1975); *see also Bradford*, 590 F.2d at 1091.

Of importance here, section 11A of the amended Exchange Act, Pub. L. No. 94-29, § 7, 89 Stat. 97, 111 (codified at 15 U.S.C. § 78k-1), "direct[s]" the Commission to "facilitate the establishment of a national market system for securities . . . in accordance with the findings and to carry out the objectives set forth" in the section. 15 U.S.C. § 78k-1(a)(2). As to those statutory findings and objectives, the Congress concluded that "[i]t is in the public interest and appropriate for the protection of investors and the maintenance of fair and orderly markets to assure," *inter alia*, "economically efficient execution of securities transactions," "fair competition among" market participants and "the availability to brokers, dealers, and investors of information with respect to quotations for and transactions in securities." *Id.* § 78k-1(a)(1)(C).

To this end, section 11A "authorize[s]" the Commission, "by rule or order, to authorize or require self-regulatory organizations"—a group currently comprised in large part of the various securities exchanges, including petitioners—"to act jointly with respect to matters as to which they share authority under [the Exchange Act] in planning, developing, operating, or regulating a national market system (or a subsystem thereof) or one or more facilities thereof." *Id.* § 78k-1(a)(3)(B); *see also*

*id.* § 78c(a)(26) (defining "self-regulatory organization"). Section 11A also creates a National Market Advisory Board—consisting of "persons associated with brokers and dealers (who shall be a majority) and persons not so associated who are representative of the public"—to advise the Commission on matters related to the national market system or its system of self-regulation by SROs. *See id.* § 78k-1(d). With respect to market data, section 11A authorizes the Commission to prescribe rules and regulations, "as necessary or appropriate" to carry out the Exchange Act's purposes, to "assure the prompt, accurate, reliable, and fair collection, processing, distribution, and publication of information with respect to quotations for and transactions in . . . securities and the fairness and usefulness of the form and content of such information." *Id.* § 78k-1(c)(1)(B).

**B.**

At "the heart of the national market system" is the collection, consolidation and dissemination of securities market data from the various securities exchanges. H.R. Rep. No. 94-229, at 93 (1975); *see also NetCoalition*, 615 F.3d at 529. In 2005, the Commission adopted Regulation NMS, 70 Fed. Reg. 37,496 (June 29, 2005), in order to streamline and promote the availability of data regarding quotations for and transactions in securities. Before 2021, Regulation NMS required each securities exchange to report its "core" market data for its NMS-traded securities to one of two centralized securities information processors (SIPs), *see* 17 C.F.R. §§ 242.601, 242.602 (2020), which in turn consolidated and disseminated the core data to subscribers, including investors, broker-dealers and data vendors, *see id.* § 242.603(a)–(b). *See NetCoalition*, 615 F.3d at 529. Consolidated core data for an NMS-traded security consisted of (1) the price, size and venue of the last sale; (2) each exchange's current highest bid and

lowest offer; and (3) the highest bid and lowest offer currently available on any exchange. *Id.* Possessing this data, "investors of all types have access to a reliable source of information for the best prices in NMS stocks." Regulation NMS, 70 Fed. Reg. at 37,503.[1]

At present, three SRO-administered NMS plans, known as the Equity Data Plans, govern the collection, consolidation and dissemination of core market data. Two plans, referred to by the Commission as the CTA and CQ Plans, cover Tape A, the consolidated data feed for securities listed on the NYSE, and Tape B, the data feed for securities listed on exchanges other than the NYSE and Nasdaq. The third plan, referred to as the UTP Plan, covers Tape C, the data feed for securities listed on Nasdaq. A NYSE affiliate serves as the SIP for Tapes A and B and Nasdaq is the SIP for Tape C. Subscribers to a particular data feed pay fees set according to the governing Equity Data Plan. Each Equity Data Plan is controlled by an operating committee, whose voting membership is limited to the SROs participating in the particular plan. Each plan also has an

---

[1] Parallel to the Commission orders at issue here, the Commission proposed and approved a rule amending Regulation NMS's "centralized consolidation model" for securities market data by expanding the definition of core market data and facilitating greater competition among data consolidators. *See generally* Market Data Infrastructure, 86 Fed. Reg. 18,596 (Apr. 9, 2021). We recently upheld the rule against challenges from these petitioners. *See generally Nasdaq Stock Mkt. LLC v. SEC*, 34 F.4th 1105 (2022). Although tangentially related to the petitions at issue here, the Market Data Infrastructure rule is not pertinent to their resolution; the Commission itself has iterated that with respect to the Market Data Infrastructure rule and the orders at issue here, "[n]either initiative depends on the other initiative being implemented before it may take effect." Order Denying Stay, Exchange Act Release No. 93,051, at 6 (Sept. 17, 2021), 2021 WL 4267323, at *7 (alteration in original and citation omitted).

administrator which, among other things, supervises the audit process for data subscriber usage and fee payments. The NYSE serves as administrator for the CTA and CQ Plans and Nasdaq serves as administrator for the UTP Plan.

## C.

Since the adoption of Regulation NMS, the Commission has observed two notable changes regarding the structure of the equity markets. First, although securities exchanges were once nonprofit entities mutually owned by their members—meaning those companies whose stock is traded on the exchange—they are now, generally speaking, demutualized and for-profit entities owned by shareholders that sell proprietary-data products. These proprietary-data products often contain exchange-specific data that goes beyond the best bid and best offer quotes contained in the core data feeds and are generally delivered much faster than the core data feeds, thereby resulting in what the Commission characterizes as a "two-tiered market-data environment." Notice of Proposed Order Directing the Exchanges and the Financial Industry Regulatory Authority to Submit a New National Market System Plan Regarding Consolidated Equity Market Data, 85 Fed. Reg. 2,164, 2,169 (Jan. 14, 2020) (Proposed Governance Order). Second, the emergence of "exchange groups"—multiple exchanges operating under the same corporate umbrella—has "consolidat[ed] much of the voting power and control of the Equity Data Plans" and resulted in uniform voting by blocs of four or five votes. *Id.* at 2,168. The Commission also observed that these exchange groups—which could command a majority of votes on the Equity Data Plans' operating committees—are the "primary producers of exchange proprietary data products." *Id.* at 2,175. The Commission concluded that the confluence of these two developments has created and exacerbated conflicts of interests between exchanges' business interests and

regulatory obligations under the Exchange Act, *id.*, and "perpetuates disincentives for the Equity Data Plans to invest in certain improvements to enhance the distribution of core data or the content of the core data itself," *id.* at 2,170.

In response to these perceived deficiencies in the Equity Data Plans, the Commission issued its Proposed Governance Order, which proposed to direct the SROs to formulate and propose a single "New Consolidated Data Plan" (later renamed the CT Plan) to replace the three Equity Data Plans. *See generally* Proposed Governance Order, 85 Fed. Reg. 2,164. Despite largely leaving the formulation of the CT Plan up to the SROs, the Commission set out three governance features. First, the CT Plan's operating committee would include representatives of six classes of equity market participants: institutional investors, broker-dealers with a predominantly retail investor customer base, broker-dealers with a predominantly institutional investor customer base, securities market-data vendors, issuers of NMS stock and retail investors. *Id.* at 2,179. These representatives would serve as voting members on the operating committee administering the CT Plan, collectively controlling one-third of the committee's voting power—using fractional votes to preserve the ratio. *Id.* at 2,180–81.

Second, the Commission recommended allocating the votes held by the SROs according to an SRO's corporate affiliation. Each "exchange group" (later called SRO Groups), defined as "multiple exchanges operating under one corporate umbrella," *id.* at 2,168, and "unaffiliated SRO," meaning an SRO not affiliated with another SRO, *id.* at 2,175 n.140, would be granted one vote on the operating committee, *id.* at 2,175. Each exchange group or unaffiliated SRO would have an additional vote if it has a "consolidated equity market share"

greater than 15%.[2] *Id.* at 2,175–76. As an illustration, the SROs under the NYSE's umbrella—New York Stock Exchange LLC, NYSE American LLC, NYSE Arca, Inc., NYSE Chicago, Inc., and NYSE National, Inc.—would be treated as one SRO Group and receive two votes, instead of receiving one vote for each SRO. Relatedly, the existing unanimity requirement for certain operating-committee actions would be replaced by an "augmented majority vote"—defined by the Commission as a "two-thirds majority of all votes on the operating committee, provided this vote also includes a majority of the SRO votes," meaning SRO Group votes. *Id.* at 2,181.

Third, the Commission proposed requiring that the CT Plan administrator be "independent," meaning "not . . . owned or controlled by a corporate entity that separately offers for sale" its own proprietary-data products. *Id.* at 2,183. The independence requirement would preclude both of the current Equity Data Plan administrators—the NYSE and Nasdaq— from subsequently serving as the CT Plan administrator.

After notice and comment, the Proposed Governance Order was finalized and approved without material change. *See* Governance Order, 85 Fed. Reg. 28,702. The SROs complied with the Governance Order, submitting a proposed CT Plan that included the three features proposed by the Commission,

---

[2] The 15% threshold was selected in order to "limit[] the total votes available to an exchange group or unaffiliated exchange to two votes." Proposed Governance Order, 85 Fed. Reg. at 2,176. The Commission concluded that the consolidated market shares of the largest exchange groups range from 17% to 23% and that setting the threshold for an additional vote at 10% would "suggest that a third vote would be appropriate at 20% of consolidated equity market share," thereby giving some exchange groups a third vote unavailable to the unaffiliated exchanges. *Id.*

*see* Notice of Filing of a National Market System Plan Regarding Consolidated Equity Market Data, 85 Fed. Reg. 64,565 (October 13, 2020), while at the same time reserving their objections to the legality of the three features, *see* Joint Appendix 209 n.13 (NYSE Comment Letter). Petitioners sought review of the Governance Order but we dismissed the challenge, concluding that the Commission had not committed to any particular governance structure and therefore the Governance Order did not constitute reviewable final agency action. *See Nasdaq Stock Mkt. LLC v. SEC*, 1 F.4th 34, 37–38, 39 (D.C. Cir. 2021); *see also* 15 U.S.C. § 78y(a)(1).

In August 2020, the Commission approved the proposed CT Plan. *See* CT Plan Order, 86 Fed. Reg. 44,142. Petitioners timely filed for review, challenging the three Commission-recommended features. Petitioners also filed with the Commission a motion to stay the CT Plan Order, which the Commission denied. Petitioners then filed for and received a stay from this Court. *See* Order, *Nasdaq Stock Mkt. LLC v. SEC*, No. 21-1167 (D.C. Cir. Oct. 13, 2021). We have jurisdiction of their challenge pursuant to section 25(a) of the Exchange Act. *See* 15 U.S.C. 78y(a)(1).

## II. ANALYSIS

Petitioners' challenge reaches both the Commission's interpretation of section 11A of the Exchange Act as well as its decisionmaking given the record and comments before it. As to the former, we review using the familiar *Chevron* two-step framework. *See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984). At step one, we ask "whether the agency-administered statute is ambiguous on the precise question at issue." *Eagle Pharms., Inc. v. Azar*, 952 F.3d 323, 330 (D.C. Cir. 2020) (internal quotation marks omitted) (quoting *Guedes v. Bureau of Alcohol, Tobacco,*

*Firearms & Explosives*, 920 F.3d 1, 28 (D.C. Cir. 2019)). If not, we assume at step two that the "Congress has empowered the agency to resolve the ambiguity" and accordingly defer to the agency's interpretation so long as it is a reasonable construction of the statute. *Util. Air Reg. Grp. v. EPA*, 573 U.S. 302, 315 (2014).

In addition, we may set aside a Commission order if it is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see NetCoalition*, 615 F.3d at 532. Besides adhering to statutory and regulatory requirements, the Commission is required to "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines v. United States,* 371 U.S. 156, 168 (1962)). The Commission's factual findings are conclusive if supported by substantial evidence. *See* 15 U.S.C. § 78y(a)(4); *NetCoalition*, 615 F.3d at 533.

Petitioners challenge the Commission's CT Plan Order and Governance Order on three grounds: First, the Commission exceeded its authority under both section 11A of the Exchange Act and Rule 608 of Regulation NMS by placing representatives of non-SROs on the CT Plan's operating committee as voting members. Second, the Commission's decision to group SROs based on corporate affiliation for voting purposes is contrary to law, as it prevents SROs from "act[ing] jointly" to effectuate the CT Plan, and it is otherwise arbitrary and capricious by failing to explain adequately the Commission's departure from its past practice of treating affiliated and unaffiliated SROs the same. Third, the Commission's requirement that the administrator of the CT

Plan be "independent"—not owned or controlled by a corporate entity that directly or indirectly sells proprietary-data products that compete with the core data feed—is arbitrary and capricious. We ultimately agree with petitioners as to their first challenge but reject their second and third challenges.

## A. Non-SRO Membership on CT Plan Operating Committee

To begin, the Commission does not argue that its interpretation of section 11A of the Exchange Act as permitting non-SRO representation on the CT Plan operating committee is necessarily compelled by the statute; the Commission instead argues that the "Congress has not 'directly spoken to th[is] precise' issue." *See* Resp't Br. 29 n.3 (alteration in original) (quoting *City of Clarksville v. FERC*, 888 F.3d 477, 482 (D.C. Cir. 2018)); *see also* Oral Arg. Tr. 19:25–20:1 (Commission is "not arguing that the statute is clear at *Chevron* [step one]"); *id.* at 20:15–18 ("[I]n the [1975] [A]mendments, Congress very specifically did not make a decision as to the precise manner in which the national market system was going to be structured.").

Our ordinary course of action would be to first determine whether section 11A is, as the Commission suggests, silent or ambiguous as to non-SRO representation issue; if so, we would then assess whether the Commission's permissive interpretation, as embodied in the various orders at issue, is reasonable. *See Chevron*, 467 U.S. at 842–43. Occasionally, however, we have assumed arguendo that a statute is ambiguous or silent and proceeded to the second step of the *Chevron* analysis. *See, e.g., Good Fortune Shipping SA v. Comm'r*, 897 F.3d 256, 261 (D.C. Cir. 2018); *Lubow v. U.S. Dep't of State*, 783 F.3d 877, 884 (D.C. Cir. 2015); *U.S. Postal Serv. v. Postal Regul. Comm'n*, 599 F.3d 705, 710 (D.C. Cir. 2010); *see also Babbitt v. Sweet Home Chapter of Cmtys. for a*

*Great Or.*, 515 U.S. 687, 703 (1995). We do so here, confident in doing so because the Commission has failed to demonstrate that its construction of section 11A is reasonable.[3]

At *Chevron* step two, we ask whether the agency's interpretation is "arbitrary or capricious in substance, or manifestly contrary to the statute." *Good Fortune Shipping*, 897 F.3d at 261 (quoting *Mayo Found. for Med. Educ. & Research v. United States*, 562 U.S. 44, 53 (2011)); *see also Village of Barrington v. Surface Transp. Bd.*, 636 F.3d 650, 665 (D.C. Cir. 2011) (asking "whether the [agency] has reasonably explained how the permissible interpretation it chose is 'rationally related to the goals of' the statute" (quoting *AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 388 (1999))). Importantly, "[t]he reasonableness of an agency's construction depends on the construction's fit with the statutory language as well as its conformity to statutory purposes." *Abbott Labs. v. Young,* 920 F.2d 984, 988 (D.C. Cir. 1990) (internal quotation marks omitted); *see also Van Hollen v. FEC*, 811 F.3d 486, 492 (D.C. Cir. 2016) ("The starting place for any *Chevron* Step Two inquiry is the text of the statute.").

Begin with the primary textual hook for the Commission's decision: section 11A(a)(3)(B) states that "[t]he Commission is authorized . . . to authorize or require self-regulatory organizations to act jointly with respect to matters as to which they share authority under [the Exchange Act] in planning, developing, operating, or regulating a national market system (or a subsystem thereof) or one or more facilities thereof." 15 U.S.C. § 78k-1(a)(3)(B); *see also* CT Plan Order, 86 Fed. Reg. at 44,157 ("Here, the Commission is acting pursuant to its

---

[3] Because we find the Commission's interpretation of section 11A—the principal basis for its asserted statutory authority—unreasonable at *Chevron* step two, we do not address petitioners' parallel argument regarding Rule 608 of Regulation NMS.

authority under Section 11A(a)(3)(B) . . . .”). The Congress explicitly reserved a role for SROs in developing and effectuating NMS plans, at the Commission’s discretion. The statute is silent, however, with respect to many details of whatever joint action the Commission so authorizes.

The Commission contends that the statutory silence allows it the discretion to direct SROs to formulate an NMS plan that permits non-SRO involvement in NMS planning and governance, albeit in a minority voting role. *See* Resp’t Br. 25–26. But section 11A(a)(3)(B) specifically identifies SROs that “share authority under [the Exchange Act]” as those the Commission authorizes to “act jointly . . . in planning, developing, operating, or regulating a national market system,” 15 U.S.C. § 78k-1(a)(3)(B), making it less likely that there is a “gap[]” for the Commission to fill with respect to what entities may act jointly, *see Ethly Corp. v. EPA*, 51 F.3d 1053, 1060 (D.C. Cir. 1995). This is the maxim of *expressio unius est exclusio alterius* at work: “[M]ention of one thing”—SROs—“implies exclusion of another thing”—non-SROs. *Ethyl Corp*, 51 F.3d at 1061 (quoting *Am. Methyl Corp. v. EPA*, 749 F.2d 826, 835–36 (D.C. Cir. 1984)). Application of the canon here is analogous to its application in *Halverson v. Slater*, 129 F.3d 180 (D.C. Cir. 1997), where we applied the *expressio unius* canon in interpreting 46 U.S.C. § 2104(a), which provides that the Secretary of Transportation may delegate certain duties “to any officer, employee, or member of the Coast Guard,” to preclude delegation to non-Coast Guard officials. *Halverson*, 129 F.3d at 184–86. We did so notwithstanding the Secretary’s general statutory authority to delegate to subordinates, *see* 49 U.S.C. § 322, finding that “the more specific provision controls.” *Halverson*, 129 F.3d at 186. Thus, although the Commission is correct that the Congress did not insert the word “exclusively” into section 11A(a)(3)(B), *see* Resp’t Br. 28–29,

the language it did choose evinces exclusivity that, in our reading, forecloses the Commission's desired interpretation.

Granted, the weight of the *expressio unius* canon is sensitive to statutory context, especially in the administrative realm where the "Congress is presumed to have left to reasonable agency discretion questions that it has not directly resolved." *Adirondack Med. Ctr. v. Sebelius*, 740 F.3d 692, 697 (D.C. Cir. 2014) (quoting *Cheney R.R. Co. v. I.C.C.*, 902 F.2d 66, 68–69 (D.C. Cir. 1990)); *see also Indep. Ins. Agents of Am., Inc. v. Hawke*, 211 F.3d 638, 644 (D.C. Cir. 2000). But "where the context shows that the 'draftsmen's mention of one thing, like a grant of authority, does really necessarily, or at least reasonably, imply the preclusion of alternatives,' the canon is a useful aide." *Hawke*, 211 F.3d at 644 (quoting *Shook v. D.C. Fin. Resp. & Mgmt. Assistance Auth.*, 132 F.3d 775, 782 (D.C. Cir. 1998)).

Here, several aspects of the statutory context cut against the Commission's interpretation. First, the Commission's reading of section 11A(a)(3)(B) *both* to expressly identify SROs as those entities that can act jointly in developing and effectuating the national market system *and* to authorize by implication a non-SRO to exercise similar governance authority would render the former superfluous. *See TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) ("[A] statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." (quoting *Duncan v. Walker*, 533 U.S. 167, 174 (2001)). Further, we have observed that the canon against surplusage and the *expressio unius* canon "are at their zenith when they apply in tandem," as they appear to do here. *Hawke*, 211 F.3d at 645. The Commission's only counter is that the express mention of SROs as those entities that may act jointly was to alleviate antitrust concerns. *See* Resp't Br. 36–38. But

the antitrust explanation, even if assumed to be plausible and supported by the legislative history, fails to answer the key question whether section 11A(a)(3)(B) implicitly permits non-SROs in governance.

Second, section 11A(a)(3)(B) specifies that SROs may be authorized "to act jointly *with respect to matters as to which they share authority under [the Exchange Act]* in planning, developing, operating, or regulating a national market system." 15 U.S.C. § 78k-1(a)(3)(B) (emphasis added). Such shared authority includes, *inter alia*, the specified duties "to protect investors and the public interest," *id.* § 78f(b)(5); *see also id.* §§ 78o-3(b)(6), 78q-1(b)(3)(F), the promulgation of internal rules subject to Commission approval, *see id.* § 78s(b), and the obligations to "comply" and "enforce compliance" with the provisions of the Exchange Act, rules and regulations thereunder and its own rules, *id.* § 78s(g)(1). The "share authority" language thus qualifies the SROs' quasi-regulatory authority and also explains why SROs are granted such authority. The non-SROs and their representatives, on the other hand, lack similarly unifying statutory and regulatory obligations and the Commission has acknowledged as much. *See* CT Plan Order, 86 Fed. Reg. at 44,154 ("Non-SRO Voting Representatives will not have the same legal obligations as the SRO Voting Representatives . . . ."); *id.* at 44,168 ("Non-SRO Voting Representatives will serve on the Operating Committee in their individual capacity and do not have regulatory obligations paralleling those of the SROs . . . ."). The Commission has not adequately explained why the Congress *expressly* highlighted the SROs' shared authority under the Exchange Act as support for their authority pursuant to section 11A and at the same time *impliedly* gave similar section 11A authority to entities that lack such shared authority under the Exchange Act.

Third, and finally, elsewhere in section 11A, the Commission is authorized to create advisory committees and employ outside experts, *see* 15 U.S.C. § 78k-1(a)(3)(A), as well as establish a "National Market Advisory Board" consisting of "persons associated with brokers and dealers" and certain "representative[s] of the public," *id.* § 78k-1(d)(1). Thus, it cannot be said that the Congress was agnostic about the role of non-SROs in the national market system. Instead, it appears to us that the Congress "considered the unnamed possibility" of non-SROs serving in a regulatory or quasi-regulatory role in the national market system "and meant to say no to it" by providing a separate, advisory role for them. *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 381 (2013) (quoting *Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 168 (2003).

In addition to section 11A(a)(3)(B), the Commission invokes section 11A(c)(1)(B), *see* CT Plan Order, 86 Fed. Reg. at 44,142 & n.14, 44,157; *see also* Resp't Br. 25–26, 29, 31, which provides, in relevant part:

> No self-regulatory organization, member thereof, securities information processor, broker, or dealer shall . . . collect, process, distribute, publish, or prepare for distribution or publication any information with respect to quotations for or transactions in any security . . . in contravention of such rules and regulations as the Commission shall prescribe as necessary or appropriate in the public interest, for the protection of investors, or otherwise in furtherance of the purposes of this chapter to . . . assure the prompt, accurate, reliable, and fair collection, processing, distribution, and publication of information with respect to quotations for and transactions in such

> securities and the fairness and usefulness of the
> form and content of such information[.]

15 U.S.C. § 78k-1(c)(1)(B). In the Commission's view, this provision supports its overarching interpretation that section 11A "necessarily contemplates the involvement of non-SROs in the collection, processing, distribution and publication of market data, because it prohibits them from doing any of those things in contravention of rules prescribed by the Commission." Resp't Br. 29; *see also* CT Plan Order, 86 Fed. Reg. at 44,157 & n.241.

But section 11A(c)(1)(B), which says nothing about the national market system or its development or operation, merely indicates that non-SROs, specifically SIPs and broker-dealers, play enough of a role in the dissemination of market data to warrant granting the Commission antifraud authority to police non-SROs. *Cf.* 15 U.S.C. § 78j (antifraud provision using similar language). It does little to support the Commission's interpretation that those same non-SROs are meant to play an affirmative role in the planning and operation of an NMS plan. Further, even if section 11A(c)(1)(B) could be read the way the Commission asserts, its general grant of authority does not override the more narrowly tailored section 11A(a)(3)(B). *See, e.g.*, *Gozlon-Peretz v. United States*, 498 U.S. 395, 407 (1991) ("A specific provision controls over one of more general application.").

In short, even assuming the Commission is correct that section 11A is ambiguous or silent on the issue of non-SRO representation in NMS plan governance, it nevertheless fails to anchor its interpretation to any reasonable reading of section 11A. As a result, the Commission's decision to include representatives of non-SROs on the CT Plan operating

committee is unreasonable and therefore invalid under *Chevron* step two.

## B. SRO Groups

Petitioners next object to the Commission's decision to allocate and limit SRO votes according to an SRO's corporate affiliation with another SRO, arguing that the decision is contrary to section 11A and otherwise arbitrary and capricious. As explained below, we find petitioners' arguments on this issue are without merit.

### 1. *"Contrary to Law"*

To begin, petitioners make two arguments that center on the text of section 11A of the Exchange Act. First, they point to the statutory definition of "self-regulatory organization," which includes "any national securities exchange." 15 U.S.C. § 78c(a)(26). Petitioners construe this definition to mean "*any* and *all* exchanges . . . each of which is a discrete, legally distinct entity" and argue that SRO Groups prevent an individual SRO from being recognized as an SRO for the purpose of joint action under section 11A(a)(3)(B). Pet'rs Reply Br. 21 (emphasis in original). Second, petitioners contend that the combination of SRO Groups and the augmented majority voting structure—which requires a majority of SRO votes and a two-thirds majority of all votes, including non-SROs—would permit committee approval even if there is opposition from a majority of *individual* SROs. *See* Pet'rs Br. 43–46. As an example,

> a proposal that is supported by all of the non-SRO voting representatives (a total of four-and-a-half votes), the four unaffiliated SROs, and the Nasdaq-affiliated SRO Group (with two votes for its three exchanges) would have

> sufficient support to be adopted under the Commission's voting framework. But assuming that the nine remaining SROs opposed the proposal, the proposal would be supported by only seven out of the sixteen individual SROs.

*Id.* at 45. As petitioners see it, this outcome "erects a barrier to 'joint[]' SRO operation of the CT Plan that is incompatible with the Exchange Act." *Id.* at 46 (quoting 15 U.S.C. § 78k-1(a)(3)(B)).

Because we find that the Commission failed to provide a reasonable interpretation of section 11A that would permit non-SRO representation in the first place, *see supra* p. 12–19, we see little need to address hypothetical voting outcomes among the SRO Groups and non-SROs or whether a particular outcome would "erect[] a barrier" to joint action pursuant to section 11A, as petitioners contend.

The crux of petitioners' remaining arguments is that section 11A(a)(3)(B) requires that each SRO, as defined in the Exchange Act, be on equal terms with respect to the governance of NMS plans, including voting. Yet nothing in section 11A appears to require the strict one-to-one voting representation by individual SROs contemplated by petitioners. For one thing, although petitioners are correct that the term "self-regulatory organization" is defined at the individual level in the definitions section of the statute, the use of its plural form in section 11A(a)(3)(B) simply establishes the universe of entities (i.e., SROs) that may be authorized by the Commission to act jointly—and no party argues that the Commission excludes any SROs from the CT Plan operating committee. Thus, the definition of "self-regulatory organization" sheds little, if any, light as to how the

Commission may allocate NMS plan operating committee votes among individual SROs.

Moreover, the undefined term "act jointly," given its ordinary meaning, *see Sorenson Commc'ns, LLC v. FCC*, 897 F.3d 214, 228 (D.C. Cir. 2018) (attributing to undefined statutory term "its ordinary meaning"), simply means to act cooperatively, together or in conjunction, *see, e.g.*, *Jointly*, The Oxford English Dictionary (2d ed. 1989) ("[t]ogether, in union" and "[i]n conjunction, combination, or concert"); *Jointly*, Webster's Third New International Dictionary (1981) ("together" and "unitedly"); *Jointly*, Ballentine's Law Dictionary (3d ed. 1969) ("[u]nitedly" and "sharing together"). "Jointly" does not require a particular level of involvement among the individual members—such as "one SRO, one vote," as petitioners seem to suggest—so long as all participants are involved to some degree. Section 11A(a)(3)(B) does not specify many details as to how the Commission may set the contours of SRO joint action. The provision makes no mention of NMS plans, operating committees or administrators yet no party objects to the Commission's use of those governance structures. This, in our view, makes it unlikely that the Congress would combine broad Commission discretion to fill in the details of whatever governance structure it envisions with an unusually rigid understanding of "act jointly" that requires one-to-one representation. Thus, we see little merit to petitioners' textual arguments.

## 2. *Departure from Commission Precedent and Disparate Treatment*

Aside from the text of section 11A, petitioners contend that the Commission's use of SRO Groups departs from the Commission's past practice of treating affiliated SROs as distinct legal entities in other regulatory settings and subjects

affiliated SROs to less favorable treatment as compared to unaffiliated SROs. Again, we find these arguments without merit.

Petitioners first cite several matters in which the Commission has required individual SROs to maintain their separate regulatory identity. *See, e.g.*, Order Setting Aside Action by Delegated Authority and Approving Proposed Rule Change Relating to NYSE Arca Data, 73 Fed. Reg. 74,770, 74,790 (Dec. 9, 2008) (separate pools of liquidity); Order Disapproving Proposed Rule Change to Offer a Rebate Based on Members' Aggregate Customer Volume in Multiply-Listed Options Transacted on NASDAQ OMX PHLX LLC or Its Affiliated Options Exchanges, 79 Fed. Reg. 42,578, 42,585–86 (July 22, 2014) (separate rebate schedules). But the fact that the Commission treats SROs as distinct and separate entities vis-à-vis their individual statutory and regulatory obligations does not necessarily mandate similar treatment of NMS plans where SROs act collectively to effectuate a market-wide plan. The Commission made this precise point. *See* CT Plan Order, 86 Fed. Reg. at 44,164 ("But both the applicable legal requirements and the function being performed here by the SROs differ in the context of the responsibility of the SROs to jointly operate the NMS plans pursuant to Section 11A of the Act and to disseminate consolidated market data, to which different SROs may contribute in varying degrees.").

Petitioners next point to the Commission's past practice of treating SROs individually with respect to earlier NMS plan operating committees. *See, e.g.*, Order Approving the National Market System Plan Governing the Consolidated Audit Trail, 81 Fed. Reg. 84,696, 84,948 (Nov. 23, 2016). We have often recognized that an agency must acknowledge and explain its departure from past policy. *See Sw. Airlines Co. v. FERC*, 926 F.3d 851, 856 (D.C. Cir. 2019). "A central principle of

administrative law is that, when an agency decides to depart from decades-long past practices and official policies, the agency must at a minimum acknowledge the change and offer a reasoned explanation for it." *Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 923 (D.C. Cir. 2017) (citing *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221–22 (2016)).

Here, the Commission easily cleared the "not . . . especially high bar" of acknowledging and explaining its departure. *Sw. Airlines*, 926 F.3d at 856. It acknowledged comments about the differing treatment of SROs for voting, recognized that "the Commission's treatment of corporate affiliations varies based on the particular facts and circumstances" and took into account corporate affiliation for voting "[b]ecause of the concentrated power affiliated SROs exert in the governance structure of consolidated equity market data, as demonstrated by the indisputable fact that affiliated SROs vote as blocs." CT Plan Order, 86 Fed. Reg. at 44,164. The Commission iterated its findings that "[i]ndividual exchanges that historically had only one vote on NMS plans are now a part of groups that can control blocs of four or five votes," *id.*, and that "'in its oversight of the Equity Data Plans, [it] is unaware of an individual affiliated exchange member' ever having 'cast its vote differently than the votes cast by its affiliated exchanges,'" *id.* (quoting Governance Order, 85 Fed. Reg. at 28,713), in support of its decision to use group-based voting. The Commission also stated its "belie[f] that reallocating votes by SRO Group should help to ensure the prompt, accurate, reliable, and fair collection, processing, distribution, and publication of" NMS market data. *Id.*

As their final argument, petitioners object to the Commission's decision on the ground that it subjects affiliated SROs to less favorable treatment than unaffiliated SROs, without adequate explanation. As a general principle, agency

action "is at its most arbitrary when it treats similarly situated people differently," *Etelson v. Off. of Pers. Mgmt.*, 684 F.2d 918, 926 (D.C. Cir. 1982), meaning that agencies must "provide an adequate explanation to justify treating similarly situated parties differently," *Burlington N. and Santa Fe Ry. Co. v. Surface Transp. Bd.*, 403 F.3d 771, 776 (D.C. Cir. 2005). But here, the Commission has provided an adequate explanation, citing the need to mitigate the Equity Data Plans' practical dilution of *unaffiliated* exchanges' voting power. In response to comments that the SRO-Group-based voting system would unfairly dilute the votes of affiliated exchanges, the Commission countered that any perceived disparate treatment between affiliated and unaffiliated exchanges was justified "from a policy perspective because of the disproportionate influence affiliated exchange groups currently exercise in [Equity Data] Plan matters by voting as a block and diluting the voting power of other Participants." Governance Order, 85 Fed. Reg. at 28,713. The Commission also reasoned that "bloc voting has diluted the voting power of unaffiliated SROs over time, and that this concentration of 'voting power in a small number of exchange group stakeholders, which also have inherent conflicts of interest,' has 'perpetuated disincentives for the Equity Data Plans to make improvements to the SIP data products.'" CT Plan Order, 86 Fed. Reg. at 44,164 (quoting Governance Order, 85 Fed. Reg. at 28,713).

## C. Independent Administrator

Petitioners' final objection is to the Commission's decision that the CT Plan administrator must be "independent"—meaning "not . . . owned or controlled by a corporate entity that, either directly or via another subsidiary, offers for sale its own [proprietary-data products]." CT Plan Order, 86 Fed. Reg. at 44,195. The Commission supported the independence requirement by noting that "an entity that acts as

the administrator while also offering for sale its own proprietary data products faces a substantial, inherent conflict of interest, because it would have access to sensitive SIP customer information of significant commercial value." *Id.*; *see also id.* at 44,196 ("Unlike the exchanges that offer for sale their own proprietary equity market data products, an independent Administrator would not have the competing objective of maximizing its own proprietary data products' profitability."). Petitioners make three arguments in support of their contention that the Commission failed to articulate a rational explanation for its decision, none of which we find persuasive.

Petitioners first contend that the Commission failed to substantiate its "purely theoretical" concern that a CT Plan administrator could misappropriate confidential information, such as by pointing to a plan administrator's past misconduct or by highlighting the shortcomings of existing safeguards. Pet'rs Br. 54. Granted, an agency is generally on sounder footing when it "act[s] upon the basis of empirical data." *Chamber of Com. of U.S. v. SEC*, 412 F.3d 133, 142 (D.C. Cir. 2005). But an agency "need not—indeed cannot—base its every action upon empirical data" and may, "depending upon the nature of the problem, . . . be 'entitled to conduct . . . a general analysis based on informed conjecture.'" *Id.* (quoting *Melcher v. FCC*, 134 F.3d 1143, 1158 (D.C. Cir. 1998)). Here, the Commission highlighted a plausible conflict of interest: the potential misuse of "sensitive SIP customer information of significant commercial value" by administrators that sell competing market data products. CT Plan Order, 86 Fed. Reg. at 44,195–96 (quoting Governance Order, 85 Fed. Reg. at 28,722). In support, the Commission invoked its experience in overseeing the existing Equity Data Plans as well as industry comments supporting the separation of the plan administrator's regulatory responsibilities from an exchange's commercial

interests. *See id.* at 44,195–96; Governance Order, 85 Fed. Reg. at 28,722–23. We have found this reasoning sufficient in the past. *See Stilwell v. Off. of Thrift Supervision*, 569 F.3d 514, 519 (D.C. Cir. 2009) (sanctioning agency's reliance on its "long experience of supervising" regulated entities and "support in various comments submitted in response to the proposed rule"); *Am. Great Lakes Ports Ass'n v. Schultz*, 962 F.3d 510, 516 (D.C. Cir. 2020) ("A degree of agency reliance on [comments from affected parties] is not only permissible but often unavoidable." (alteration in original) (quoting *Nat'l Ass'n of Regul. Util. Comm'rs v. FCC*, 737 F.2d 1095, 1124 (D.C. Cir. 1984))); *cf. FCC v. Nat'l Citizens Comm. for Broad.*, 436 U.S. 775, 814 (1978) (permitting agencies to rely on "deductions based on the expert knowledge of the agency" (citation omitted)). That the Commission's conflict of interest worry has not yet manifested itself is of little consequence, as an agency has the latitude to "adopt prophylactic rules to prevent potential problems before they arise"—that is, "[a]n agency need not suffer the flood before building the levee." *Stilwell*, 569 F.3d at 519.

Petitioners next fault the Commission for not extending the independent administrator requirement to non-SRO data vendors, even though those vendors sell market data products and could have similar conflicts of interest. *See* Pet'rs Br. 54–56. But "an agency need not target every danger in order to target any danger," *Am. Coal Co. v. Fed. Mine Safety and Health Rev. Comm'n*, 796 F.3d 18, 29 (D.C. Cir. 2015), and instead "may marshal their limited resources by pursuing their goals 'as priorities demand,'" *id.* (quoting *Nat'l Cong. of Hispanic Am. Citizens (El Congreso) v. Marshall*, 626 F.2d 882, 888 (D.C. Cir. 1979)). Here, the Commission explicitly acknowledged that it "chose to address one substantial, inherent conflict of interest" in imposing the independent administrator requirement but permits the CT Plan operating

committee to "exercise discretion in selecting the new Administrator" in order to police other conflicts that may arise. CT Plan Order, 86 Fed. Reg. at 44,197. Although petitioners contend that non-SRO data vendors face "the exact same conflict" as SROs selling competing data products, *see* Pet'rs Br. 55 (emphasis omitted), the conflict is not the same because, as the Commission notes, the SROs have "sufficient voting power" and "incentive" to ensure that any non-SRO chosen to serve as administrator "would [not] face a financial conflict of interest and act as a direct competitor to the SROs' proprietary data business," CT Plan Order, 86 Fed. Reg. at 44,158, 44,197. Even if the CT Plan Order permits disparate treatment between SROs and representatives of non-SROs, the Commission has provided "a reasoned explanation" for such treatment. *Burlington N. & Santa Fe Ry.*, 403 F.3d at 777.

Third, and finally, petitioners assert that the Commission failed to consider whether "more good than harm will come" from an independent administrator requirement that excludes incumbent administrators that possess institutional knowledge and expertise—the NYSE and Nasdaq. *See* Pet'rs Br. 56–57 (quoting *Md. Peoples Counsel v. FERC*, 761 F.2d 768, 779 (D.C. Cir. 1985)); *cf. Michigan v. EPA*, 576 U.S. 743, 753 (2015) ("[R]easonable regulation ordinarily requires paying attention to the advantages *and* the disadvantages of agency decisions." (emphasis in original)). But the Commission acknowledged this argument in the CT Plan Order and reasoned that any loss in incumbent experience would be mitigated by the "broad range of financial service firms, unaffiliated with an SRO," capable of serving as plan administrator and by the current administrators' abilities to "advise and facilitate the onboarding process of the new Administrator." CT Plan Order, 86 Fed. Reg. at 44,196–97. It further concluded any lingering "costs" resulting from a loss of expertise or experience are "justified because the inherent

conflicts of interest identified by the Commission . . . raise[] significant concerns regarding access to confidential subscriber information." *Id.* at 44,197. Thus, we see no merit to petitioners' argument that the Commission failed to consider the disadvantages or costs of the independent administrator requirement.

## D. Severability *Vel Non*

Because we conclude that only one component of the Commission's orders is invalid, there is the resulting question of severability. The APA defines "agency action" as "the whole or a part of an agency rule [or] order," 5 U.S.C. § 551(13) (incorporated by 5 U.S.C. § 701(b)(2)), meaning that we are permitted to sever and set aside an offending portion while keeping intact the rest of the order. *See Carlson v. Postal Reg. Comm'n*, 938 F.3d 337, 351 (D.C. Cir. 2019); *see also K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 294 (1988). Severability turns on agency intent, meaning that "[w]here there is substantial doubt that the agency would have adopted the same disposition regarding the unchallenged portion if the challenged portion were subtracted, partial affirmance is improper." *Epsilon Elecs., Inc. v. U.S. Dep't of Treasury*, 857 F.3d 913, 929 (D.C. Cir. 2017) (quoting *North Carolina v. FERC*, 730 F.2d 790, 795–96 (D.C. Cir. 1984)). Further, we ask whether the remaining parts of the agency action can "function sensibly without the stricken provision." *Carlson*, 938 F.3d at 351 (quoting *Sorenson Commc'ns Inc. v. FCC*, 755 F.3d 702, 710 (D.C. Cir. 2014)). Here, we decline to sever with respect to the CT Plan Order—and thus vacate the order in its entirety. Regarding the antecedent Governance Order, we sever only the provision requiring petitioners to provide for non-SRO representation on the operating committee of any proposed plan and uphold the remainder of the Governance Order.

As to the CT Plan Order, the Commission made clear that its principal focus was replacing the three Equity Data Plans with a single, consolidated NMS plan that included the three Commission-recommended governance features. *See* CT Plan Order, 86 Fed. Reg. at 44,142–43; *see also* Proposed Governance Order, 85 Fed. Reg. at 2,182. In fact, the Commission evinced little regard for the rest of the CT Plan, stating that terms "not directed by the Governance Order" were within the control of the SROs, subject to Commission review and approval. CT Plan Order, 86 Fed. Reg. at 44,143. We therefore have "substantial doubt[s]" that the Commission would have permitted the CT Plan to be implemented in a piecemeal fashion and absent the provision requiring non-SRO representation on the operating committee, one of only three features the Commission required all SRO-proposed plans to include. *See Epsilon*, 857 F.3d at 929; *see also Sierra Club v. FERC*, 867 F.3d 1357, 1367 (D.C. Cir. 2017) (finding "substantial[] doubt" agency would have conducted piecemeal environmental review of pipeline project when it had previously "treated the project as a single, integrated proposal").

Moreover, permitting the remaining provisions of the CT Plan to take effect raises the question whether the CT Plan could "function sensibly." *Carlson*, 938 F.3d at 351 (quoting *Sorenson Commc'ns*, 755 F.3d at 710). For example, the CT Plan, as proposed and approved by the Commission, requires that representatives of non-SROs hold one-third of the voting power on the committee and that committee approval under its "augmented majority" voting structure requires a "two-thirds majority of all votes on the operating committee" alongside "a majority of the SRO . . . votes." CT Plan Order, 86 Fed. Reg. at 44,165; *see also id.* at 44,213 (CT Plan § 4.3(b)). Yet, if we were to invalidate the non-SRO representation provision and leave the remainder of the CT Plan intact, that would result in

simultaneously requiring both a two-thirds *and* a simple majority vote of approval by the SROs alone. This one example highlights how the challenged features of the CT Plan are "intertwined" in such a way that makes severance problematic. *See Epsilon*, 857 F.3d at 929 (quoting *Davis Cty. Solid Waste Mgmt. v. EPA*, 108 F.3d 1454, 1459 (D.C. Cir. 1997)).

The Commission, for its part, pays little more than lip service to our concern that severing parts of the CT Plan Order would render the plan unworkable. It first makes the unsupported statement that, if one of the challenged provisions of the CT Plan is found to be unlawful, "the remaining provisions could 'function sensibly.'" Resp't Br. 56 (quoting *Carlson*, 938 F.3d at 351–52). As explained above, we struggle to see how that is the case. The Commission then invokes the severability provision included in the CT Plan itself, which states that "any determination that any provision of the CT Plan is invalid or unenforceable shall not affect the validity or enforceability of any other provisions of the CT Plan, all of which shall remain in full force and effect." CT Plan Order, 86 Fed. Reg. at 44,207. But "the ultimate determination of severability will rarely turn on the presence or absence" of a severability clause. *Cmty. for Creative Non-Violence v. Turner*, 893 F.2d 1387, 1394 (D.C. Cir. 1990) (quoting *United States v. Jackson*, 390 U.S. 570, 585 n.27 (1968)). Instead, we look to agency intent and whether the valid portions can function absent the invalid portions, *id.*; doing so, we conclude that the CT Plan, as currently constructed, would be unworkable if we simply severed the provision requiring non-SRO representation.

As to the Governance Order, it does not commit the Commission to any particular NMS plan or plan feature and is instead "no more than a call for a proposal that would then be subject to further notice, comment, and revision." *Nasdaq*, 1

F.4th at 37; *see also* Order Denying Stay, 85 Fed. Reg. 36,921, 36,922 (June 18, 2020) (describing Governance Order as "first step toward establishing a new governance structure"). It was based on its lack of finality that we dismissed as premature petitioners' earlier challenge to the Governance Order. *Nasdaq*, 1 F.4th at 39. In line with this understanding of the Governance Order, we see no need to vacate those portions that direct the SROs to include plan features we have found permissible. We therefore sever only those parts of the Governance Order directing petitioners to include non-SRO representation in its proposed plan, leaving the remainder in place.

For the foregoing reasons, we grant the petitions for review as to the inclusion of non-SROs on the CT Plan's operating committee as voting members and vacate the CT Plan Order in its entirety. With respect to the Governance Order, we vacate only those portions authorizing the invalid non-SRO representation, leaving the remainder of the Governance Order intact.

*So ordered.*