Notice: This opinion is subject to formal revision before publication in the
Federal Reporter or U.S. App. D.C. Reports.  Users are requested to notify the
Clerk of any formal errors in order that corrections may be made before the
bound volumes go to press.

# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

————

Argued February 16, 2005          Decided April 8, 2005

No. 04-1162

BURLINGTON NORTHERN AND SANTA FE RAILWAY COMPANY,
PETITIONER

v.

SURFACE TRANSPORTATION BOARD AND
UNITED STATES OF AMERICA,
RESPONDENTS

AEP TEXAS NORTH COMPANY,
INTERVENOR

————

On Petition for Review of an Order of the
Surface Transportation Board

————

*Samuel M. Sipe, Jr.* argued the cause for petitioner.  With
him on the briefs were *Alice E. Loughran*, *Richard E. Weicher*,
and *Michael E. Roper*.

*Rachel Danish Campbell*, Attorney, Surface Transportation

Board, argued the cause for respondents. With her on the brief were *Robert H. Pate, III*, Assistant Attorney General, *Robert B. Nicholson* and *John P. Fonte*, Attorneys, *Ellen D. Hanson*, Deputy General Counsel, Surface Transportation Board, and *Thomas J. Stilling*, Attorney.

*Kelvin J. Dowd* argued the cause for intervenor. With him on the brief were *Karen H. Herren*, *William L. Slover*, and *Kendra A. Ericson*.

Before: ROGERS, TATEL and GARLAND, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* ROGERS.

ROGERS, *Circuit Judge*: Burlington Northern and Santa Fe Railway Company ("BNSF") petitions for review of the decision of the Surface Transportation Board vacating the rate prescription governing its transportation of coal from the Rawhide coal mine in the Powder River Basin of Wyoming to a coal-fired electric generating station owned and operated by intervenor AEP Texas North Company ("AEP Texas"). *W. Tex. Utils. Co. v. Burlington N. & Santa Fe Ry. Co.*, 2004 WL 542864 (Mar. 19, 2004) ("*Decision*"). BNSF contends that the Board contravened Congress' policy of minimizing federal regulation of the railroad industry in two ways: first, by granting AEP Texas's motion to vacate the rate prescription without requiring the shipper to satisfy the evidentiary requirements for reopening under the Interstate Commerce Commission Termination Act of 1995 ("the Act"), 49 U.S.C. § 722(c) (2000), and second, by endorsing disparate treatment of shippers and carriers seeking to vacate a rate prescription. We reject AEP Texas's challenge to BNSF's standing, and hold that the Board's explanation for disparate treatment of shippers and carriers bound by the same rate prescription is arbitrary and capricious. Accordingly, we grant the petition, vacate the *Decision*, and

remand the case to the Board.

**I.**

Under the Act, a railroad ordinarily may establish any rate it chooses for the transportation it provides, provided it does not discriminate against connecting lines. *See* 49 U.S.C. § 10701(c). However, where a railroad has "market dominance over the transportation to which a particular rate applies," its rate must be reasonable. *Id.* §10701(d)(1); *see id.* § 10709(a). A carrier is conclusively presumed not to have market dominance where it shows that the revenues produced by the rate are less than the statutory floor for regulatory intervention: 180 percent of the carrier's variable cost of providing the transportation. *Id.* § 10707(d)(1)(A). Even where a carrier has market dominance, the Board may not examine the reasonableness of the carrier's rate except upon complaint filed by an affected shipper. *See id.* § 10704(b).

Where, after filing a complaint, a shipper demonstrates that a carrier's rate is unlawful, the Board may prescribe the maximum rate that the carrier may charge for transportation. *Id.* § 10704(a)(1). The Board determines the reasonableness of the challenged rate based on "constrained market pricing" ("CMP") principles set forth in the *Coal Rate Guidelines, Nationwide*, 1 I.C.C.2d 520 (1985), *aff'd sub nom. Consol. Rail Corp. v. United States*, 812 F.2d 1444 (3d Cir. 1987) ("*Coal Rate Guidelines*"), which the Board concluded would "meet [its] dual objectives of providing railroads the real prospect of attaining revenue adequacy while protecting captive coal shippers from 'monopolistic' pricing practices," *id.* at 524-25. CMP establishes three main constraints on rates that may be charged to captive traffic: revenue adequacy, management efficiency, and stand-alone cost ("SAC"). Under the SAC analysis, carriers are to use observed market demand as the basis for pricing, while ensuring that a shipper not bear the cost of facilities and

services from which it derives no benefit. *Coal Rate Guidelines,* 1 I.C.C.2d. at 528. The Board utilizes the SAC test to set the variable rate over the period covered by the SAC analysis, based on the rate an optimally efficient stand-alone railroad would hypothetically need to charge to serve the traffic of the complaining shipper to fully recover its costs, including a reasonable return on investment. *Id*.

The underlying dispute involves AEP Texas's challenge to BNSF's tariff for transporting coal from the Rawhide mine to the Oklaunion Generating Station after the expiration of the parties' rail transportation contract in 1994. The background to the current appeal appears in *Burlington N. R.R. v. Surface Transp. Bd.*, 114 F.3d 206 (D.C. Cir. 1997). *See also Burlington N. R.R. v. Surface Transp. Bd.*, 75 F.3d 685 (D.C. Cir. 1996). In 1996, responding to AEP Texas's predecessor's challenge, the Board found that BNSF's rate was excessively high, and based on a twenty-year SAC analysis (covering 1995 to 2014) prescribed the maximum reasonable rate level at 180 percent of BNSF's variable cost of providing service. *W. Tex. Utils. Co. v. Burlington N. R.R. Co.*, 1 S.T.B. 638, 661 (Apr. 25, 1996) ("*West Texas I*"). The Rawhide Mine closed in 1997. For several years thereafter, BNSF voluntarily charged AEP's predecessor the Rawhide rate for traffic from its other mines. Then, in June 2000, BNSF announced its intention to increase the rate from non-Rawhide mines. *W. Tex. Utils. Co. v. Burlington N. R.R. Co.*, 2000 WL 1665124 (Nov. 3, 2000). AEP Texas's predecessor objected, arguing the Rawhide prescription applied more broadly to other mines in the Powder River basin. *Id.* at 2. The Board disagreed but stated it would consider supplemental evidence and reopen the proceeding to receive evidence concerning other mines. *Id*. at 5.

When the Rawhide Mine reopened in 2002, BNSF sought clarification of the *West Texas I* rate prescription, requesting the

Board rule, in light of the fact that the SAC rate no longer fell below the regulatory floor, that BNSF was entitled to charge the higher of the SAC rate or the regulatory floor. The Board obliged, observing that while the analysis in *West Texas I* showed that the SAC rate initially fell below the jurisdictional threshold, it should have been clear that the rate might exceed that threshold in future years, and therefore the Board should have prescribed a maximum reasonable rate at the higher of the SAC rate or the statutory jurisdictional rate threshold, as the Board had done in subsequent proceedings. *W. Tex. Util. Co. v. Burlington N. & Santa Fe Ry. Co.*, 2003 WL 21359571, 3-4 (May 28, 2003) (*"West Texas II"*). The Board rejected the argument by the shipper that it first should have the opportunity to re-litigate the SAC rate, explaining that to reopen the proceedings based on new evidence or substantially changed circumstances, the shipper would need to file an appropriate petition for reopening. *Id.* Two months after denying reconsideration, *W. Tex. Utils. Co. v. Burlington N. R.R. Co.*, 2000 WL 1665124 (Nov. 7, 2000), the Board clarified that the invitation to submit evidence of substantially changed circumstances should not be construed as "allowing a change in the fundamental assumptions upon which the original SAC analysis was based," *W. Tex. Utils. Co. v. Burlington N. & Santa Fe Ry. Co.*, 2003 WL 21704153, 3 (July 22, 2003) (*"West Texas III"*). The Board instructed that:

> If a shipper wishes to establish a current maximum reasonable rate using a SAC analysis that is based on different assumptions than originally used, its recourse is to have the rate prescription vacated, allow the railroad to establish a new common carrier rate, and then file a complaint challenging the railroad's new rate.

*Id.* at 3. The Board added: "This limitation is necessary to achieve a proper balance between the interests of fairness to all

parties and of administrative finality and repose.  *Id.* (citing *Ariz. Pub. Serv. Co. v. Atchison, T.& S.F. Ry.*, 3 S.T.B. 70, 75 (1998)).

Thereafter, on August 11 and September 3, 2003, respectively, AEP Texas filed a new rate complaint and a petition to vacate the rate prescription to enable BNSF to establish a new common carrier rate which, if necessary, AEP Texas could then challenge and seek reparations, which it subsequently did.  On March 19, 2004, the Board granted AEP Texas's petition and vacated the rate prescription.  *Decision*, 2004 WL 542864 at 1.  The Board stated:

> As the proponent and beneficiary of the rate prescription, the complaining shipper should be entitled to have that prescription vacated upon request, without having to show that the prescription is now defective.  [1] This policy is appropriate to ensure that a captive shipper who prevails on its rate complaint in the first instance does not later end up in a worse position–by having to bear a higher rate than would be justified under a new SAC analysis–than if it had not earlier challenged the rate or had been unsuccessful in its earlier challenge.  This is a particular concern given the long period of time covered by a SAC analysis (usually looking forward 20 years) and any resulting rate prescription.  [2] The economic and regulatory conditions reflected in the SAC analysis can change significantly over that time period.  The rate prescription, which was imposed to protect the captive shipper from unreasonably high rates, should not become the source of a rate that would now be considered unreasonable under a SAC analysis.

*Id.* at 3.  The Board rejected BNSF's concern that it would be subject to repetitive rate litigation over the same traffic, stating that "nothing prevents an unsuccessful complainant from

pursuing a new complaint immediately, and nothing binds that shipper to its prior evidentiary presentation." *Id.* The Board also observed that while the carrier is restored to rate setting freedom, the shipper has relinquished the benefits of a prior rate prescription, must take service under the new rate established by the carrier, and bears the risk that a new rate complaint may be unsuccessful. *Id.* BNSF petitions for review.

## II.

As a threshold matter, we address AEP Texas's challenge to BNSF's standing to petition for review of the Board's *Decision*. AEP contends that BNSF is not aggrieved by the *Decision* because the vacated rate prescription "was entered solely for the benefit of AEP Texas, and the only effect of the [*Decision*] on BNSF was to restore the carrier's discretion to set any rate it chose on AEP Texas'[s] coal traffic–which discretion BNSF exercised." Br. of Intervenor-Resp't at 2. Although acknowledging its present challenge to BNSF's discretionary rate, AEP Texas points out that BNSF's "rate-setting freedom cannot be constrained unless and until the [Board] issues a final decision finding the rate unreasonably high and ordering it reduced." *Id.* Hence, AEP Texas contends, BNSF cannot show any "injury in fact" arising from the *Decision*.

Under the Hobbs Act, a party seeking review of a decision by the Board must demonstrate that it has been aggrieved by the agency action. 28 U.S.C. § 2344 (2000). Proof of such aggrievement requires a showing of both Constitutional and prudential standing. *See Shell Oil Co. v. FERC*, 47 F.3d 1186, 1200-01 (D.C. Cir. 1995). For the Court to find Constitutional standing, BNSF must establish that: (1) it has suffered an injury-in-fact, that (2) was caused by the decision of the Board, and that the injury (3) would be redressed by the relief sought from the court. *Raytheon Co. v. Ashborn Agencies, Ltd.*, 372 F.3d 451, 453 (D.C. Cir. 2004).

As a consequence of the *Decision* vacating the rate prescription, BNSF's rate-making freedom was restored. But, contrary to AEP Texas's contention, it does not follow that BNSF cannot show injury-in-fact. AEP Texas is seeking to have it both ways: On the one hand, AEP Texas contends that BNSF cannot show injury-in-fact as a result of the *Decision* setting aside the rate prescription, while on the other hand it has filed a complaint alleging that the identical discretionary rate BNSF is imposing is unreasonably high and that reparations are due. As BNSF responds, "its injury is obvious" because prior to the *Decision*, the rate prescription would have remained in effect until 2014. Instead, although BNSF in the exercise of its discretion set the rate for Rawhide coal traffic at the same rate as the previously prescribed rate, BNSF is presently a defendant in an action by AEP Texas seeking reparations for charges made at that rate.

Had the revised rate prescription remained in effect, BNSF would be shielded from liability for reparations to AEP Texas if the Board determined the prescribed rate was unlawful. BNSF no longer enjoys this protection. This is a cognizable injury sufficient to confer standing. *See Rio Grande Pipeline Co. v. FERC*, 178 F.3d 533, 536, 540 (D.C. Cir. 1999); *Int'l Bhd. of Elec. Workers v. ICC*, 862 F.2d 330, 334 (D.C. Cir. 1988). "The possibility that AEP Texas will be unsuccessful in that action does not eliminate the injury caused by the risk of an adverse action or the burdens of the litigation itself." Reply Br. of Pet'r at 3. AEP Texas's reliance on *Shell Oil Co.*, 47 F.3d at 1186, is misplaced; in that case, the challenged agency order did not deprive the company of a previously-held protection. Moreover, the measure of certainty for the arrangement of BNSF's business affairs as a result of the rate prescription ceased with the *Decision*, for the longevity of any future rate prescription would be subject to a shipper's mere request to vacate and expose BNSF to increased litigation over the reasonableness of its rates.

*See Raytheon Co.*, 372 F.3d at 454; *Idaho Power Co. v. FERC*, 312 F.3d 454, 460 (D.C. Cir. 2002). There also can be no doubt that BNSF satisfies the remaining Article III standing requirements, because its injury flows from the *Decision* and may be redressed if the court grants its petition for review.

There is no merit to Intervenors' contention that BNSF cannot satisfy the requirements of prudential standing because "[r]ailroads . . . are not within the zone of interests intended to benefit from prescription orders." Br. of Intervenor-Resp't at 10. "In deciding whether a litigant has prudential standing . . . [t]he court 'should not inquire' whether Congress intended to benefit or regulate the litigant. It is enough that the litigant's interest is 'arguably' one regulated or protected by 'the statutory provision at issue.'" *PDK Labs. v. U.S. D.E.A.*, 362 F.3d 786, 791 (D.C. Cir. 2004) (quoting *Nat'l Credit Union Admin. v. First Nat'l Bank*, 522 U.S. 479, 488-89, 92 (1998)). Because BNSF is subject to the rate prescription, its interest in preventing dissimilar treatment of carriers and shippers seeking to vacate a rate prescription is within the zone of interests regulated by the Act. We turn, then, to the merits of BNSF's petition.

## III.

An agency must provide an adequate explanation to justify treating similarly situated parties differently. *Petroleum Communications Inc. v. FCC*, 22 F.3d 1164, 1172 (D.C. Cir. 1994) (and cases cited therein); *Willis Shaw Frozen Express, Inc. v. ICC*, 587 F.2d 1333, 1336 (D.C. Cir. 1978); *Ace Motor Freight, Inc. v. ICC*, 557 F.2d 859, 862 (D.C. Cir. 1977). Where an agency applies different standards to similarly situated entities and fails to support this disparate treatment with a reasoned explanation and substantial evidence in the record, its action is arbitrary and capricious and cannot be upheld. *Willis Shaw Frozen Express, Inc.*, 587 F.2d at 1336; *Ace Motor Freight, Inc.*, 557 F.2d at 862.

Prior to the challenged *Decision*, the Board and its predecessor, the Interstate Commerce Commission, have required that the party seeking to vacate a rate prescription demonstrate a change in legal or factual circumstances which would render the prior rate analysis invalid. *See, e.g.*, *CF Indus. Inc. v. Kaneb Pipe Line Partners*, 2004 WL 1802304 (2004); *San Antonio v. Burlington N.*, 364 I.C.C. 887 (1981); *Ark. Rice Traffic Bureau v. Aberdeen & Rockfish R.R. Co.*, 219 I.C.C. 5, 46-47 (1936); *Cherry-Burrell Corp. v. Atchison, Topeka & Santa Fe Ry. Co.*, 210 I.C.C. 148 (1935); *Cady Lumber Corp. v. Apache Ry. Co.*, 155 I.C.C. 56, 57 (1929). Under the new policy announced in the *Decision*, shippers and carriers are subject to different standards when seeking to vacate a rate prescription: A shipper will be granted vacatur upon request, while a carrier must show a change in circumstances which would call into question the prior rate analysis.

The Board gave three reasons for granting a shipper's petition to vacate a rate prescription without an evidentiary showing of material error, new evidence, or changed circumstances. First, the Board wanted to ensure that a captive shipper who prevails on its rate complaint does not subsequently find itself in a worse position as a result of having to pay a higher rate than would have been justified under a new SAC analysis. *Decision,* 2004 WL 542864 at 3. Second, the Board took account of the fact that vacation of the rate prescription affords the carrier rate-making freedom while the shipper bears a substantial burden to show a new rate is unreasonable. *Id.* Third, the Board was satisfied that BNSF's concerns about repetitive rate litigation failed to account for the fact that "nothing prevents an unsuccessful complainant from pursuing a new complaint immediately, and nothing binds that shipper to its prior evidentiary presentation." *Id.* For the following reasons, we conclude that the Board's justification in the *Decision* for disparate treatment is flawed.

Reference to the relative procedural postures of the parties before the Board cannot alone substantiate the Board's disparate treatment of the parties. *See Ace Motor Freight, Inc.*, 557 F.2d at 865. Allowing differential treatment on the basis that the shipper is the proponent and beneficiary of a rate prescription fails to account for the fact that both shipper and carrier are bound by a prescribed rate: A carrier may not charge more than the rate ceiling while the shipper cannot avoid paying that rate should it choose to take service from the carrier. *See Ariz. Grocery Co. v. Atchison, T. & S.F. Ry. Co.*, 284 U.S. 370, 387-89 (1932). This remains true even though the rate prescribed may be higher than the rate sought by the shipper in a rate challenge proceeding. While a rate prescription exists only after the Board finds that a carrier's established rate was unlawful, the rate prescribed must satisfy the dual purpose of protecting the shipper from monopolistic practices while ensuring a carrier adequate revenues. *Consol. Rail Corp.*, 812 F.2d at 1450. And while a carrier may have charged an unlawful rate prior to the rate prescription, so long as its rate thereafter is made pursuant to the rate prescription, its conduct is lawful and shielded from liability for reparations.

Additionally, the Board does not explain how a change in circumstances would impact carriers or shippers differently for purposes of seeking vacation of a rate prescription. In its *Decision*, the Board states that "the economic and regulatory conditions reflected in the SAC analysis can change significantly" over the long period of time covered by the analysis, and that a shipper should not be held captive to a rate prescription it initially sought. *Decision*, 2004 WL 542864 at 3. This may be so, but it does not indicate why a carrier, who also may be adversely impacted by changes in economic and regulatory conditions, should not be afforded similar consideration. Regardless, the Board cannot justify eliminating the evidentiary burden requiring that a shipper show a change in

circumstances based on the likelihood that a shipper will suffer from a change in circumstances. The circularity of this reasoning is evident, and Board counsel was unable during oral argument to articulate any reason other than changed circumstances that would render the rate prescription at issue unreasonable.

Finally, the Board overlooked binding precedent in stating that nothing constrained a shipper from filing repeated petitions. *Decision*, 2004 WL 542864 at 3. In *Traugott Schmidt & Sons v. Michigan Central Railroad Co.*, 23 I.C.C. 684 (1912), the ICC dismissed "as a matter of course," a complaint because it contained identical claims by the same party whose complaint had been dismissed one year and three months earlier. *Id.* at 685. "[W]hen a matter has been once fully considered and decided it must be regarded as settled unless it appears from new facts presented that the Commission was wrong." *Id.* Counsel for the Board conceded during oral argument that *Traugott Schmidt & Sons* is binding on the Board. Yet the Board stated that "nothing binds [a] shipper to its prior evidentiary presentation." *Decision*, 2004 WL 542864 at 3. The Board cannot rely on an erroneous description of its precedent to justify a new policy treating carriers and shippers dissimilarly. *See generally Petroleum Communications, Inc.*, 22 F.3d at 1172; *Pub. Media Ctr. v. FCC*, 587 F.2d 1322, 1331 (D.C. Cir. 1978).

Undoubtedly, the Board's effort to protect captive shippers is not easily accomplished in the complex task of rate making. *See Coal Rate Guidelines*, 1 I.C.C.2d at 524, 549-52 (Statements of Comm'rs Simmons and Strenio); *see also W. Va. Pub. Servs. Comm'n v. U.S. Dep't of Energy*, 681 F.2d 847, 853 (D.C. Cir. 1982). While the Board has suggested additional considerations on appeal to support the *Decision*, *e.g.*, Br. of Resp't at 22, the court is confined to review of the reasons set forth by the Board in the challenged *Decision*. *El Rio Santa Cruz Neighborhood*

*Health Ctr., Inc. v. U.S. Dep't of Health & Human Servs.*, 396 F.3d 1265, 1276 (D.C. Cir. 2005); *SEC v. Chenery Corp.,* 318 U.S. 80, 95 (1943). Absent inclusion of a reasoned basis for determining that rate prescriptions should be more readily subject to vacation upon the petition of a shipper than a carrier, the Board's *Decision* is arbitrary and capricious. *See Willis Shaw Frozen Express*, 587 F.2d at 1336; *Ace Motor Freight*, 557 F.2d at 862.

Accordingly, we grant the petition, vacate the *Decision*, and remand the case to the Board. *See San Antonio v. United States*, 631 F.2d 831 (D.C. Cir. 1980), *clarified by* 655 F.2d 1341 (D.C. Cir. 1981), *rev'd on other grounds, Burlington N., Inc. v. United States*, 459 U.S. 131 (1982). In light of our disposition we need not reach BNSF's other contentions, including whether vacatur is governed by the substantive standards in 49 U.S.C. § 722(c) rather than the notice provisions of 49 U.S.C. § 722(b).